# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
September 13, 2016 Session

## IN RE: QUADAYVON H., ET AL.

**Direct Appeal from the Juvenile Court for Knox County**
**No. 133151      Timothy E. Irwin, Judge**

---

### No. E2016-00445-COA-R3-PT-FILED-SEPTEMBER 30, 2016

---

This appeal involves the termination of a father's parental rights to two of his children. The children's mother's rights were previously terminated. In 2010, the older child was adjudicated dependent and neglected due to his mother's drug use; the father was incarcerated at the time. In 2012, both children were adjudicated dependent and neglected and removed from their mother's home after an altercation involving the father and another child resulted in father's arrest and mother's arrest for drug use. In 2015, the Tennessee Department of Children's Services filed a petition seeking to terminate the father's parental rights on the statutory grounds of persistence of conditions and mental incompetence. The juvenile court found that both grounds were proved by clear and convincing evidence and also found by clear and convincing evidence that termination of the father's rights was in the children's best interests. The father appeals. We reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and THOMAS R. FRIERSON, JJ., joined.

George E. Bennett, Seymour, Tennessee, for the appellant, Kevin H.

Herbert H. Slatery III, Attorney General and Reporter and William Derek Green, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee, Department of Children's Services.

John W. Stephenson, Guardian ad Litem.[1]

---

[1]No brief was filed on appeal by the Guardian ad Litem.

# OPINION

## Background and Procedure

Quadayvon H.[2] and Eric N. were born out-of-wedlock to Kevin H. ("Father") and Vanessa N. ("Mother") in February, 2007 and November, 2011, respectively. Quadayvon, along with his three older brothers,[3] was placed in the custody of the Tennessee Department of Children's Services ("the Department") due to Mother's drug use and resulting incarceration on November 19, 2009, and was first adjudicated dependent and neglected on April 26, 2010. Father was incarcerated at the time of removal and had only recently been released from incarceration by the time of the adjudication of dependency and neglect. Several permanency plans were put in place with the goal to return the children to their parents. At a permanency hearing on February 16, 2011, the court found that Father was not in substantial compliance with the plan due to recently getting out of jail and admitting that he would fail a drug screen. Father was again found not in substantial compliance with the permanency plan following a hearing on November 30, 2011. By April 12, 2012, Mother regained full custody of three of her children, and Quadayvon began a trial home placement with Mother. The April 12, 2012 order provided that Father, who was again incarcerated, would be allowed to move into the Mother's residence following his release from incarceration so long as his return did not "jeopardize the safe and appropriate placement of the children" with Mother.

On June 11, 2012, the Department filed a petition for temporary legal custody of the children, alleging that Father had been involved in an altercation with one of the older boys, leading to Father's arrest, and that Mother tested positive for oxycodone and opiates for which she had no prescription. Quadayvon and Eric were placed into foster care on June 8, 2012. On December 11, 2012, the juvenile court entered an order finding the children, including Quadayvon and Eric, dependent and neglected and awarding temporary custody to the State of Tennessee. After a permanency hearing on May 22, 2013, the juvenile court found Father to "now [be] in substantial compliance" with the permanency plan and stated that the proposed goal for the plan was to return the children to their parents. Then, after another permanency hearing on September 23, 2014, Father was found to be only in partial compliance with the permanency plan due to not having housing and being "unable to demonstrate appropriate parenting and anger management despite cooperation with mental health services." Finally, after a hearing on August 26,

---

[2]In cases involving a minor child, it is this Court's policy to redact names in order to protect the child's identity. In this case, in order to preserve both clarity and the anonymity of the child, we will redact the names of individuals sharing the child's surname and will refer to those individuals by their given name and the first letter of their surname.

[3]The older brothers, who are also Father's children, are now adults.

2015, Father was found not to be in substantial compliance with the permanency plan due to a failure to release mental health records and cooperate with the Department as well as failure to maintain visitation. The Department filed a petition to terminate Father's parental rights to Quadayvon and Eric on June 2, 2015,[4] alleging persistence of conditions as grounds for termination and also that Father was mentally incompetent to care for the children. The juvenile court heard testimony and argument in this matter on January 13 and January 19, 2016.

The juvenile court first heard testimony from Dr. James Murray ("Dr. Murray"), who testified as an expert in forensic psychology. Dr. Murray conducted a clinical interview with Father in July 2014 and reviewed records from Father's psychologist, Dr. Hunter. Dr. Murray reported that Father's participation and demeanor "varied widely at times and quite dramatically." According to Dr. Murray, Father was, at times, "at least superficially cooperative and even friendly," but on "other occasions he was overtly provocative, angrily accusatory and verbally hostile in a manner that could be construed as threatening." He stated that Father seemed particularly agitated when addressing questions about substance abuse or mental illness. By way of example, Dr. Murray shared that Father, at times, denied having substance abuse issues, but at "other times he admitted it when I pressed him on it. [Then] when you would press him on a lack of clarity or evasiveness, or we got this information from another source, those are the times when he tended to get verbally hostile." Dr. Murray reported that he found in his evaluation "symptoms consistent with aspects of schizoaffective disorder, particularly impulsivity, instability and mood, and instances that were suggestive of thought disorder, confusion, perhaps delusional thinking and paranoia, and also evidence for substance abuse, particularly alcohol abuse." With respect to Father's intellectual functioning, Dr. Murray testified that he administered the Wechsler Abbreviated Scale of Intelligence, an assessment that provides a "very viable and useful estimate for IQ." According to Dr. Murray, Father's results would translate to an IQ of 73, which is three points up from the range considered intellectually disabled. As a result of Dr. Murray's evaluation, he opined that Father's mental state was "highly likely to negatively impact his capacity to function adequately across many areas of adaptive functioning, including parenting." However, he also admitted that he was unable to offer testimony to a reasonable degree of medical or scientific certainty that Father was so mentally impaired that he would be unable to properly raise or care for the children. Rather, Dr. Murray emphasized that "schizoaffective disorder is a high risk factor," but would not, in and of itself, be an impediment to a parent raising a child. Finally, Dr. Murray noted that while he may typically spend anywhere between an hour and a half to forty hours evaluating an individual, he only evaluated Father for three and a half to four hours because Father was "uncooperative and the information he was providing was unreliable."

---

[4]Mother's parental rights were terminated by prior order of the juvenile court.

The court also heard from a number of social workers representing various organizations. Danielle Lawrence, a regional supervisor for in-home services with Youth Villages, testified that Father was verbally aggressive with her at the courthouse in August 2015. According to Ms. Lawrence, Father was speaking to one of his children with whom he had a no contact order inside the courthouse lobby when she asked Father's lawyer to stop the conversation. Ms. Lawrence then "either smiled or made some kind of noise," which, according to her, caused Father to "start[] yelling," call her a "bitch" and state that he was going to slap her. Additionally, Ms. Lawrence testified that Father stared at her for the rest of that day. In her other involvements with Father, Ms. Lawrence claimed that he became agitated very easily and would quickly escalate and deescalate. Similarly, Britney Bailey, a supervisor for the Department, recalled an incident in September 2014 after a court hearing where Father walked toward her and a Youth Villages worker pointing and yelling. Ms. Bailey claims that Father got within arms-length of her but also noted that she does not remember why Father was yelling.

Melcharle Thompson, a case manager for the Department, corroborated Ms. Bailey's account of the September 2014 courthouse incident. Additionally, Ms. Thompson testified that although she attempted to help Father obtain furniture for his apartment, he threatened to "spaz out on [her], just as if what the people said on that paper" because she had to remind him not to speak with one of his children with whom he had a no contact order. She also described visitations between Father and his children where Father would be fixated on an issue and become agitated to the point that he needed to "step out and calm down." Without noting when the incident occurred, Ms. Thompson testified that she had observed Father curse at Mother, spit in her face, and pull the windshield wipers off Mother's car. Ultimately, according to Ms. Thompson, the Department decided to assign a male worker to Father in October 2015. With respect to Father's parenting skills, Ms. Thompson testified that she believed there were safety issues with Father's parenting. Specifically, Ms. Thompson noted that during one visitation session Eric was running around the room with a candy sucker in his mouth, and that Brent Ward, a case manager for Child Help, needed to instruct Father several times to not allow Eric to do so.[5] Mr. Ward, who also testified, described Father's visits with the children as "mostly [] good," but noted that Father acted more like a peer than a parent. Father typically engaged in play during the visits. Mr. Ward also described two occasions, one in February 2013 and the other in December 2013, where Father became angry with a Department worker, began yelling, and had to be deescalated. According to Mr. Ward, these "de-escalations" consisted of asking Father to calm down, which he did. Mr. Ward admitted that he had not had any involvement with Father since September 2014 and could not testify to anything Father had done since that time.

---

[5]In his testimony, Brent Ward also described the incident with the sucker. In response to that testimony, the court stated, "I'm not real concerned about that. Yeah, that's a bad thing, you try to keep that from happening but it's no big black mark on the list for me . . . ."

Rachel Fogarty, a case manager with Child Help, testified about Father's visits with Quadayvon and Eric. She described Father as typically arriving on time and noted that he would call if he was going to be late. Father typically brought a snack for the boys. According to Ms. Fogarty, Father would try to engage with the boys, but most of the time they were resistant to his efforts. She stated that Father has boundary issues with the boys. For example, during those visits, Father would try to hug the boys although they asked him not to. Additionally, Ms. Fogarty opined that Father presents safety issues during his interaction with the boys by acting more like a peer than parent. She described instances where the boys would stand on the furniture in the visitation room and Father would not tell them to get down. She also stated that occasionally Eric would punch or kick Quadayvon and Father would not intervene. Ms. Fogarty described an incident where Father became angry with another social worker, yelled at him, and apparently wagged his finger at the worker.

Shannon Dow, a clinical social worker providing services to Quadayvon, testified that Quadayvon experiences anxiety and depression and that he has poor self-identity. Ms. Dow stated that she believes Quadayvon's anxiety is caused by visits with Father. According to Ms. Dow, Quadayvon is afraid of Father's aggressiveness and complains that Father "acts crazy." Quadayvon and Eric's foster mother also testified about the boys' well-being and her interaction with Father. She noted that the boys came to live with her and her husband on June 11, 2012, when Eric was six and a half months old and Quadayvon was five. The foster mother described the boys as being agitated when returning from visits with Father. However, she testified that the boys do well in her home and that she and her husband are prepared to adopt the boys if they become available for adoption. With respect to her interaction with Father, she testified, without specifying a time or place, that Father cursed at her and her husband. She could not recall what Father might have said but stated that she knew it "was very vulgar."

Quadayvon, eight years old at the time of trial, testified about his foster home and visits with Father. He stated that he and his brother, Eric, are doing well in the foster home and that his foster parents take good care of him. He earns As and Bs in school and likes to watch movies. Quadayvon described his last visit with Father as "[n]ot so good." During the visit, Father put the boys on the phone with Mother, who already had her rights terminated. Quadayvon testified that he does not want to see Father. He stated that he is scared of Father because he saw Father have an altercation with his older brother. If sent back to live with Father, Quadayvon remarked that he is worried that he and Eric "might die" and that he would have to take Eric and run away.

The court also heard testimony from Father. Father, who was fifty years old at the time of trial, lives in a two-bedroom apartment and receives social security income in the amount of $734 per month. He testified that he occasionally receives additional income

by doing yard work for people. He pays his bills every month and does not need any assistance with daily tasks. One of Father's adult children and Mother's elderly father stay in Father's apartment from time to time. When Mother's father stays in his apartment, Father cares for him, feeds him, and bathes him. Father stated that Mother also stays with him on occasion. During his testimony, Father discussed the circumstances that led to his children being removed to foster care. With respect to the original removal in November 2009, which included Quadayvon, but not Eric, who had not yet been born, Father noted that he was incarcerated at the time the children were removed from Mother's home. The second removal occurred in June 2012, after an altercation between Father and one of his older children resulted in neighbors calling the police. Father testified that the altercation started when the older child threw a ceramic bowl and hit Eric. Father became upset with the older child, which in turn caused the child to leave the house cursing. Father indicated that he grabbed the older child and tried to get him back into the house to calm down. According to Father, neighbors who observed the incident reported that Father choked the child, which Father denied, and Father was arrested. However, Father did admit that he "guess[ed] [the incident] was [his] fault." Beyond that incident, Father generally denied being involved in domestic violence and stated that he has never hit Mother. If they did have an incident, it would be more of a "grab and shove." He said that he hadn't put his hands on Mother in about 14 or 15 years.

Father also discussed his history of alcohol use, interactions with various social workers and his children, and his treatment with Dr. Hunter. While he admitted that he had been arrested for DUI and public intoxication several times, most recently in 2015 after leaving a party, he stated that he does not have any alcohol or drug issues. He stated that he does not use illegal drugs, nor is he currently on probation. According to Father, he does not drink beer every day but only occasionally. He drinks alone in his apartment to "socialize." Father generally denied having been verbally aggressive toward social workers but admitted to verbal altercations with staff where he would accuse them of "always butting in." Father also admitted telling Ms. Thompson that he might "spaz out" on her. Father attributed his anger towards a system that he believes is not fair and "run[s] over [him]." He expressed that he had given "all the clean urine tests that [the Department] wanted, did all this anger management, all this drug assessment. I did everything you all wanted and you all still trying to terminate it on me." However, Father noted that the boys "need good parenthood." He stated that he appreciates that "they[6] [] did a good job with [the boys]," but he emphasized that he loves his children and that he would not be going through this process, including riding a bicycle to the courthouse, if he did not love them. With respect to the boys' safety, Father denied that he allowed the boys to stand on the furniture. In fact, he stated that he was the one who told the boys to

---

[6]Presumably meaning The Department and the foster family.

get down but noted that he just had a "different way of approaching it" than did the social worker. Father acknowledged that Quadayvon is scared of him but stated that he believes Quadayvon has "been manipulated a little bit." Speaking on the issue of putting the boys on the phone with Mother, whose rights had been terminated, Father explained that he did not realize Mother was not allowed to talk to the boys.

Father credits his treatment with Dr. Hunter, which began in 2012, for "chang[ing] [his] ways a little bit." Father stated, "It made me a better person . . . . You know, I used to be real snappy and jumpy, but it slowed my roll, well it slowed me down." Father worked on anger management, parenting, and emotional issues with Dr. Hunter. Father admitted that he refused to take medicine that was prescribed to him because he did not want it. Father last saw Dr. Hunter in July 2015, but Dr. Hunter left that office so Father was transferred to a new doctor, Dr. Jung. He saw another doctor twice before transferring to Dr. Jung but determined that he had to ride his bicycle too far to get to that doctor. With respect to Dr. Murray's evaluation, Father disagreed with Dr. Murray's conclusions and stated that Dr. Murray did not spend enough time with him. He said he felt like Dr. Murray asked certain questions to support a conclusion that he had already reached. Overall, Father explained that he feels like he has done what the Department has asked him to do. He stated that he's never given "dirty urine" and that he "did the anger stuff, did the drug assessment stuff, got me a place." Additionally, he noted that he's eligible to have his driver's license reinstated.

The juvenile court entered an order on February 24, 2016, terminating Father's parental rights to Quadayvon and Eric. In its order, the juvenile court found that two statutory grounds for termination had been met: persistence of conditions and mental incompetence. The court also found that termination of Father's parental rights was in the best interest of Quadayvon and Eric. The court's lengthy findings discussed Father's psychiatric state and frequent altercations with social workers and therapists. The court specifically noted that Father's "mental illness would be a high risk factor and an impediment to parental functioning." The court also noted that the Department "does not dispute that [Father] has made diligent efforts to comply with the permanency plan to the best of his ability" but went on to find that Father "nevertheless remains unable to demonstrate appropriate parenting and anger management." The court found no evidence that Father uses drugs but stated that he instead substitutes alcohol. With respect to Quadayvon and Eric, the court stated that it "does not question [Father's] love for his children but love alone does not make an individual a proper parent . . . . He has not learned that apologizing after the fact does not make it okay to yell at people and threaten them. He has not learned to respect personal space." Overall, the court found that Father "has made some progress over the last 5 years, but not such that it would be safe for the children to be in his home." The court noted that although Father now has an apartment that is "physically (structurally) healthy and safe," that Father's "sporadic use of alcohol

does not render him consistently [able] to care for the children in a safe and stable manner but does increase the risk of aggressive and uncontrolled behavior." The court also found that

> Despite years of supervised and therapeutic visitation, with parenting skills discussed and modeled, [Father] continues to interact with his children as if he were another child. He plays with them and he chases them around the room but he does not exercise any parental control, resulting in repeated safety issues.

The court stated that "[t]he children are entitled to a safe, secure, and loving home" and determined that termination was in their best interest. Father appealed.

## Issues

Father raises the following issues on appeal, which we have reworded slightly:

I.    Whether the trial court erred in finding by clear and convincing evidence that Father was incompetent to adequately provide for the further care and supervision of the children as defined by Tennessee Code Annotated section 36-1-113(g)(8)(B)(i).

II.   Whether the trial court erred in finding by clear and convincing evidence that Father had demonstrated a persistence of conditions that, in all reasonable probability, would cause the children to be subjected to further abuse or neglect pursuant to Tennessee Code Annotated section 36-1-113(g)(3).

III.  Whether the trial court erred in finding by clear and convincing evidence that termination of Father's parental rights was in the best interest of the children.

## Standard of Review

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007); *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005). Although the parent's "right is fundamental and superior to the claims of other persons and the government, it is not absolute." *In re J.C.D.*, 254 S.W.3d at 437. A parent's right "continues without interruption only as long as a parent has not relinquished it,

abandoned it, or engaged in conduct requiring its limitation or termination." *Id.*; *see also In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In Tennessee, proceedings to terminate parental rights are governed by statute. "Parties who have standing to seek the termination of a biological parent's parental rights must prove two things." *In re Audrey S.*, 182 S.W.3d at 860; *see also In re M.J.B.*, 140 S.W.3d at 653. First, they must prove the existence of at least one of the statutory grounds for termination, which are listed in Tennessee Code Annotated section 36-1-113(g). *Id.* Several grounds for termination are listed in subsection (g), but the existence of any one of the grounds enumerated in the statute will support a decision to terminate parental rights. *In re Angela E.*, 303 S.W.3d 240, 251 (Tenn. 2010); *In re S.R.C.*, 156 S.W.3d 26, 28 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). Second, the petitioner must prove that terminating parental rights is in the child's best interest, considering, among other things, the factors listed in Tennessee Code Annotated section 36-1-113(i). *In re Audrey S.*, 182 S.W.3d at 860. "In light of the constitutional dimension of the rights at stake in a termination proceeding under [Tennessee Code Annotated Section] 36-1-113, the person seeking to terminate these rights must prove all the elements of the case by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). In sum, in order to terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013); *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). "Clear and convincing evidence" has been defined as "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Valentine*, 79 S.W.3d at 546). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Audrey S.*, 182 S.W.3d at 861.

Because of this heightened burden of proof in parental termination cases, on appeal we must adapt our customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). *In re Audrey S.*, 182 S.W.3d at 861. First, we review each of the trial court's specific factual findings *de novo* in accordance with Rule 13(d), presuming the finding to be correct unless the evidence preponderates against it. *In re Adoption of Angela E.*, 402 S.W.3d at 639. Second, we must determine whether the facts (either as found by the trial court or as supported by the preponderance of the evidence) amount to clear and convincing evidence that one of the statutory grounds for termination exists. *Id.* at 639-40. "Whether a statutory ground has been prove[n] by the requisite standard of evidence is a question of law to be reviewed *de novo* with no presumption of

correctness." *In re R.L.F.*, 278 S.W.3d 305, 312 (Tenn. Ct. App. 2008) (citing *In re B.T.*, No. M2007-01607-COA-R3-PT, 2008 WL 276012, at *2 (Tenn. Ct. App. Jan. 31, 2008)).

## Analysis

## A. Persistence of Conditions

This case involves the statutory ground for termination that is commonly referred to as "persistence of conditions," defined in Tennessee Code Annotated section 36-1-113(g)(3) as existing when:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> > (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> > (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> > (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3) (2010 & Supp. 2013). In order to terminate parental rights, there must be clear and convincing evidence of each of these elements. *In re Valentine*, 79 S.W.3d at 550. The purpose behind the "persistence of conditions" ground for terminating parental rights is "'to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child.'" *In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012) (quoting *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)).

However, "as a threshold requirement for the applicability of the ground of persistence of conditions in termination of parental rights cases, the child must not only have been adjudicated dependent and neglected, but he or she must also have been removed from the defendant parent's home." *In re Mickia J.*, No. E2016-00046-COA-R3-PT, 2016 WL 5210794, at *5 (Tenn. Ct. App. Sept. 19, 2016) (citing Tenn. Code Ann. § 36-1-113(g)(3)). Recently, this Court discussed a factually similar case, *In re Maria B.S.*, in which a father's parental rights were terminated on the ground of persistence of conditions. However, the children had not, in fact, been removed from the

father's home because he was incarcerated at the time of the removal. In reversing the ground of persistence of conditions, we explained:

> We next address whether the Trial Court erred in finding and holding that clear and convincing evidence existed to terminate Father's parental rights to the Children pursuant to Tenn. Code Ann. § 36-1-113(g)(3). Father argues that this ground could not be applied to his case as the Children were not removed from his home by order of a court. "The child has been removed from the home of the parent or guardian by order of a court . . . ." Tenn. Code Ann. § 36-1-113(g)(3) (Supp. 2012).
>
> We agree with Father as to this issue. Father was incarcerated at the time of the Children's birth. No one removed the Children from Father-he never had the children in the first place. There is case precedent to support Father's position that, without removal from that parent's home, the ground of persistent conditions is inapplicable. *See In re T.L.*, No. E2004-02615-COA-R3-PT, 2005 WL 2860202, at *7 (Tenn. Ct. App. Oct. 31, 2005), Rule 11 appl. perm. appeal denied Feb. 17, 2006*; In re D.L.B.*, No. W2001-02245-COA-R3-CV, 2002 WL 1838147, at *9 (Tenn. Ct. App. Aug. 6, 2002), rev'd on other grounds, 118 S.W.3d 360 (Tenn. 2003); *In re B.P.C.*, M2006-02084-COA-R3-PT, 2007 WL 1159199, at *7 (Tenn. Ct. App. April 18, 2007), no appl. perm. appeal filed. The Foster Parents offer no compelling counterargument, and we decline to depart from this precedent. The Trial Court erred in finding and holding that clear and convincing evidence exists to terminate Father's parental rights under the ground of persistent conditions.

*In re Maria B.S.*, No. E2012-01295-COA-R3-PT, 2013 WL 1304616, at *11 (Tenn. Ct. App. Mar. 4, 2013); *see also In re Destaney D.*, No. E2014-01651-COA-R3-PT, 2015 WL 3876761, at *5 (Tenn. Ct. App. June 23, 2015) (*no perm. app. filed*) ("The legal deficiency concerning the trial court's determination regarding this ground for termination lies in the fact that the Children were not removed from Father's home. The testimony at trial established that the reason for the Children's removal was drug abuse by the mother when the Children were in the mother's custody."); accord *In re K.M.K.*, No. E2014-00471-COA-R3-PT, 2015 WL 866730 (Tenn. Ct. App. Feb. 27, 2015) (*no perm. app. filed*). As in *Maria B.S.*, this Court reversed a finding of persistence of conditions in *In re Mickia J.* because the father was incarcerated at the time of the child's removal. *In re Mickia J.*, 2016 WL 5210794, at *5.

Here, the record reflects that Father was incarcerated at the time of Quadayvon's original removal, and it is entirely unclear with respect to whether Father was staying in Mother's home when the boys, including Eric, were removed for the second time. Father

was undoubtedly physically present in the home, given that he was involved in an altercation with one of his older children, but Mother denied that Father was actually living in the home. Moreover, Quadayvon was in a trial home placement with *Mother*, not Father, at the time of the second removal. Simply put, the clear and convincing standard is a high bar that has not been met in this case with respect to the ground of persistence of conditions. What is clear is that Father was incarcerated at the time of the original removal. However, the record is decidedly unclear as to where Father was living at the time of the second removal and whether the boys were actually removed from Father's home. Based on the foregoing authority, we conclude that the statutory ground of persistence of conditions is not applicable to Father under the facts in the record.

## B. Mental Incompetence

The court also found by clear and convincing evidence that Father "is incompetent to adequately provide for the further care and supervision of the children because [his] mental condition is presently so impaired and is so likely to remain impaired that it is unlikely that [he] will be able to assume the care of and responsibility for the children in the near future" pursuant to Tennessee Code Annotated section 36-1-113(g)(8)(B). As noted above, the juvenile court relied on Dr. Murray's testimony regarding his evaluation of Father, including Dr. Murray's assessment of Dr. Hunter's notes, testimony from social workers, and Father's own testimony in making its determination as to this issue. The juvenile court appeared to be specifically concerned with Father's perceived inability to control his anger, issues involving alcohol, and parenting skills. However, the court also noted in its order that it "is not finding that [Father] is [intellectually impaired] or that his cognitive functioning alone prevents him from parenting his children." Rather, the court stated that "there is no evidence that [Father] has corrected his emotional/psychological problems and those problems do prevent him from parenting these children."

In *In re C.C.*, we recently discussed how this Court has analyzed and applied the statutory ground of incompetence:

> Previously, we have declined to terminate parental rights under Tenn. Code Ann. § 36-1-113(g)(8) where "both psychologists opined that [f]ather and [m]other could learn to competently parent with intensive, long-term intervention." *In re Christopher S.*, No. E2012-02349-COA-R3-PT, 2013 WL 5436673, at *17 (Tenn. Ct. App., Sept. 27, 2013). Even when a parent had been diagnosed with a mild intellectual disability, we have declined termination on this ground when the parent "had successfully obtained vocational training, maintained employment, utilized public transportation, maintained a household, and secured a competent support system." *Id.*

(citing *State, Dep't of Children's Servs. v. Whaley*, No. E2001-00765-COA-R3-CV, 2002 WL 1116430, at \*14 (Tenn. Ct. App. May 30, 2002)). For this ground, we have found termination appropriate when expert testimony revealed that a parent suffers from a "lifelong condition" in which the parent "functioned in such a low range that *no amount of training, education, or counseling* could bring him up to the level where he could parent these children." *State, Dep't of Children's Servs. v. Mims*, 285 S.W.3d 435, 449 (Tenn. Ct. App. 2008) (internal quotation marks omitted; emphasis added).

*In re C.C.*, No. E2016-00475-COA-R3-PT, 2016 WL 5266669, at \*12 (Tenn. Ct. App. Sept. 22, 2016). In that case, we reversed, as a matter of law, that the evidence in the case was sufficient to clearly and convincingly show that the parent's parental rights should be terminated based on mental incompetence, in part, because an expert testified that "it would be difficult to say" whether or not the parent would be capable of parenting. *Id.* at \*13. Ultimately, although we acknowledged that the trial court cited various examples to indicate the parent's "borderline intellectual functioning" and "perceived inability to 'parent . . .,'" we disagreed that the totality of the evidence showed the ground clearly and convincingly. *Id.* at \*13.

Here, we also disagree that the totality of the evidence shows this ground clearly and convincingly. Although Dr. Murray expressed concern that Father's "psychiatric disturbances" are "a high risk factor," he could not testify to a reasonable degree of medical certainty that Father's mental state would be an impediment to raising his children. As in *In re C.C.*, the issue in this case is not whether Father has impaired cognitive functioning. Rather, the issue is whether his impairment adversely affects his ability to parent his children. The record clearly demonstrates that Father has an adverse relationship with most, if not all, of the social workers representing his children in this case. The record demonstrates that Father has yelled at, pointed at, and perhaps even cursed at individuals with whom he has perceived issues. That said, outside of potentially failing to stop his children from standing on furniture or running with a sucker in their mouths, the record sheds little light on whether Father's mental impairments adversely affect his ability to *parent*. While past domestic violence is a potential cause for concern, the record does not adequately connect Father's mental impairments with incidents that occurred in 2012 and earlier. Accordingly, we reverse the trial court's finding that Father is incompetent to adequately provide for the further care and supervision of his children.

Having determined that grounds for termination of Father's parental rights do not exist, discussion of the children's best interest is pretermitted.

## Conclusion

For the foregoing reasons, we reverse the trial court's order terminating Father's parental rights. This opinion does not affect the placement of the legal custody of the children. Going forward, as in the past, that custody is in the Department of Children's Services until such time as it is changed by court order. Costs of this appeal are taxed to the Appellee, the State of Tennessee, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE

14